# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RAYMOND ROMANO, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   v.<br><br>LORDSTOWN MOTORS CORPORATION, STEPHEN S. BURNS, DAVID T. HAMAMOTO, MARK A. WALSH, ANDREW C. RICHARDSON, STEVEN R. HASH, and JUDITH A. HANNAWAY,<br><br>       Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Raymond Romano ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Lordstown Motors Corporation ("Lordstown" or the "Company") f/k/a DiamondPeak Holdings Corp. ("DiamondPeak"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Lordstown, DiamondPeak, and related parties; (c) review of news articles, shareholder communications, conference call transcripts, and analyst reports concerning Lordstown's and DiamondPeak's public statements and those of their officers and directors, including Lordstown's Chief Executive Officer ("CEO"), Defendant Stephen S. Burns ("Burns"); and (d) review of other publicly available information concerning the Company.

I.    **NATURE OF THE ACTION**

1.    Plaintiff brings this securities class action on behalf of all persons or entities that (1) purchased DiamondPeak or Lordstown common stock between August 3, 2020 and March 24, 2021, inclusive (the "Class Period") and were damaged thereby; and/or (2) purchased and held DiamondPeak common stock as of September 21, 2020 (the "Record Date"), and had the right to vote on the merger between DiamondPeak and Lordstown pursuant to the Proxy Statement dated October 8, 2020 (the "Proxy Statement") and were damaged thereby.  The action alleges that Defendants violated Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      DiamondPeak is a special purpose acquisition company ("SPAC")—also known as a "blank check" company—formed for the sole purpose of acquiring an existing business. DiamondPeak, which had no commercial operations of its own, went public in its February 2019 initial public offering ("IPO") raising more than $250 million, with its shares trading on the NASDAQ stock exchange under the ticker symbol "DPHC."  At the time, DiamondPeak stated that it would "focus [its] search for a target business with a real estate related component" and "with an enterprise value of between $350 million and $2.0 billion."  Under the terms of its IPO, DiamondPeak was required to redeem all its publicly traded shares if it failed to complete a business combination within two years of the offering.

3.      With time running out on its two-year window to complete a business combination, DiamondPeak identified its acquisition target by Fall 2020: Lordstown.

4.      Lordstown is an electric vehicle startup company.  In June 2020, the Company revealed its full size, all-electric pickup truck—dubbed "Endurance"—in a splashy ceremony that received national media attention.  During the event, Lordstown's CEO, Defendant Burns, heavily promoted the Endurance's growth prospects, declaring that "we have our whole year, our first year of production already pre-sold."

5.      On August 3, 2020, in a joint press release, DiamondPeak and Lordstown announced that they entered into a definitive merger agreement, through which Lordstown would be the surviving company and become publicly traded under the ticker symbol "RIDE" (the "Merger").  The combination was subject to a majority vote of DiamondPeak shareholders.  The joint press release trumpeted a purported 27,000 pre-orders for the Endurance, representing $1.4 billion in potential revenue, which Defendants touted as evidence of the significant demand for the

electric truck by fleet customers.  The companies also declared that the Endurance was on track for commercial production in the second half of 2021.

6.      On August 3, 2020, Defendant Burns appeared on CNBC's *Fast Money* to tout the purported popularity of the Endurance, stating that "we got 27,000 pre-orders and we got customers really really wanting the truck."  In late September 2020, just weeks before going public on the NASDAQ through a SPAC, the Company announced that its book of pre-orders for the Endurance had now reached 40,000.  Defendants claimed that the purportedly large numbers of "pre-orders" for the Endurance represented strong commercial demand from actual customers operating fleets of trucks.

7.      On October 8, 2020, DiamondPeak and Lordstown Motors issued the Proxy Statement soliciting shareholders' approval for the Merger, which was filed with the SEC on Schedule 14A.  The Proxy Statement repeated Defendants' claims that Lordstown had significant demand for its vehicles and already had received 38,000 pre-orders, and that these pre-orders came primarily from fleet purchasers. In addition, the Proxy Statement touted Lordstown's ability to meet its lofty commercial production and sales milestones.

8.      Defendants disseminated the Proxy Statement to DiamondPeak shareholders on October 8, 2020, and recommended they approve the Merger at an anticipated shareholder vote on October 22, 2020.  The Merger was approved by a majority of DiamondPeak shareholders based on the representations in the Proxy Statement and closed on October 23, 2020.

9.      Lordstown shares began trading on the NASDAQ on October 26, 2020, closing at a price of $18.97 per share.  That same day, Defendant Burns specifically cited the 40,000 pre-order figure as "pent-up demand" for the Endurance and emphasized that "I don't think we've even scratched the surface."

10.     In November 2020, Lordstown stated that its pre-orders for Endurance now reached 50,000, and similarly assured investors that "[t]his figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders."  In an interview on CNBC's *Mad Money* on November 17, 2020, Burns further assured investors that most of the pre-orders were signed by the CEOs of large firms, and were thus "very serious orders."

11.     By January 2021, the Company's announced that pre-orders for the Endurance had soared to 100,000, which Defendants hailed as "unprecedented in automotive history" and put Lordstown in a position to "revolutionize the pickup truck industry."  In a February 23, 2021 interview with *Yahoo! Finance*, Defendant Burns reaffirmed the 100,000 pre-order figure and emphasized that Lordstown had "pre-sold 100,000 of these vehicles to various fleets across America— so really a big appetite."  Defendants continued to tout the strong demand for the Endurance and the Company's growth prospects throughout the Class Period, consistently pointing to Lordstown's purported book of 100,000 pre-orders for the Endurance.

12.     In truth, Defendants statements regarding the Endurance were materially false and misleading and failed to disclose material adverse facts about Lordstown and its business, operations, and prospects.  Specifically, Defendants failed to disclose that: (1) the number of Endurance pre-orders was fabricated, and therefore inflated, and thus did not accurately reflect demand; (2) Lordstown had fabricated the pre-orders in order to give prospective investors a false sense of confidence; and (3) as a result of the foregoing, the Proxy Statement's positive statements about Lordstown's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

13.     In particular, Defendants knew but failed to disclose a substantial amount of these "pre-orders" for the Endurance consisted of orders from customers that did not operate commercial fleets or did not have the financial means to purchase the trucks.  Moreover, the Proxy Statement failed to disclose that numerous orders were generated by a small consulting firm that was paid $30 to $50 for each "pre-order" it placed.  Defendants also hid from investors that the Company faced significant production obstacles and, moreover, had not yet completed testing and validation required to meet federal safety standards.  According to a former Lordstown employee, these obstacles meant that, rather than being poised to capitalize on the strong demand for the Endurance, production of the Endurance remained at least three to four years away throughout the duration of the Class Period.   As a result, the Proxy Statement, and Defendants' prior statements in the August 3, 2020 press release and on *Fast Money*, which touted the purportedly strong demand for Lordstown electric vehicles as demonstrated through its large number of pre-orders for the Endurance, as well as setting forth the Company's timeframes to produce and deliver the Endurance, were materially false and misleading.

14.     The truth began to emerge on March 12, 2021, when the investment research firm Hindenburg Research issued a scathing investigative report (the "Hindenburg Report") titled, "The Lordstown Motors Mirage: Fake Orders, Undisclosed Production Hurdles, and a Prototype Inferno."  Based on extensive research, including "conversations with former employees, business partners and an extensive document review," the Hindenburg Report revealed that Lordstown "is an electric vehicle SPAC with no revenue and no sellable product" that "misled investors on both its demand and production capabilities."  The Hindenburg Report concluded that Lordstown's book of 100,000 pre-orders for its proposed EV truck "are largely fictitious and used as a prop to raise capital and confer legitimacy."   Additionally, the Hindenburg Report estimated that the

Endurance was in fact three to four years away from production, citing as evidence an interview with a former Lordstown employee familiar with the production of the Endurance who explained that the Company had built fewer than 10 prototypes to date and had not completed any of the required testing and validation of the prototypes.  On this news, Lordstown's share price declined $2.93 per share, or 17%, falling from $17.71 per share on March 11, 2021 to $14.78 per share on March 12, 2021.

15.     Then, on March 17, 2021, during an earnings call with investors after market close, the Company's CEO disclosed that Lordstown was under investigation by the SEC, and that Lordstown's board of directors had formed a special committee to conduct an internal inquiry. On this news, Lordstown's share price declined $2.08 per share, or nearly 14%, falling from a close price of $15.09 per share on March 17, 2021 to a close of just $13.01 per share on March 18, 2021.

16.     Finally, on March 24, 2021, Hindenburg Research published additional pictures of an Endurance truck after it broke down and had to be loaded onto a tow truck during the filming of a commercial that had aired just days prior to the Merger.  In response to this revelation, Lordstown's stock price fell another $1.21 per share, or more than 9%, closing at $11.38 per share on March 24, 2021, 40% the closing price of Lordstown stock on its first day trading on the NASDAQ on October 26, 2020.

17.     As a direct result of Defendants' materially false and misleading statements, and the sharp decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

## II.     <u>JURISDICTION AND VENUE</u>

18.     The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(a), and 78t(a); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.)

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Lordstown is headquartered in this Judicial District.

21.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    <u>PARTIES</u>

22.     Plaintiff Raymond Romano, as set forth in the accompanying certification, incorporated by reference herein, purchased DiamondPeak and Lordstown common stock during the Class Period, held such DiamondPeak shares as of the Record Date, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Lordstown is a Delaware corporation with its principal executive offices located in Lordstown, Ohio.  Following the Merger, Lordstown common stock began trading on

the NASDAQ under the ticker symbol "RIDE."  Before the Merger, such shares traded on NASDAQ as the common stock of DiamondPeak under the ticker symbol "DPHC."

24.     Defendant Burns is Lordstown's CEO and Chairman of its the Board of Directors, and he served in these capacities at all relevant times. Defendant Burns signed the Proxy Statement on behalf of the Company and made improper statements in connection with the solicitation of shareholder votes in favor of the Merger.

25.     Defendant Burns, because of his positions with the Company, possessed the power and authority to control the contents of Lordstown's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Burns was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information, Defendant Burns knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations that were being made were then materially false and/or misleading.  Defendant Burns is liable for the false statements pleaded herein, as those statements were each "group-published" information and were the result of the actions of Burns and other officers and directors of the Company.

26.     Defendant David T. Hamamoto ("Hamamoto") served as DiamondPeak's Chairman and CEO between November 2018 and October 2020, and has served as a director to its successor, Lordstown Motors, since the Merger.  Defendant Hamamoto knowingly, recklessly, or negligently made (or allowed to be made) improper statements in Lordstown's (and its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Hamamoto

8

also negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the solicitation of shareholder votes in favor of the Merger. As of November 30, 2020, Hamamoto beneficially owned 4,229,135 shares of Lordstown Class A common stock and 1,826,396 warrants that were worth more than $120 million. Additionally, on October 22, 2020, while the price of Lordstown's common stock was artificially inflated by the Defendants' false and misleading public statements and omissions, and while Hamamoto was in possession of material, adverse nonpublic information, he sold one million shares of personally held Lordstown stock at artificially inflated prices for proceeds of more than $16 million.

27. Defendant Mark A. Walsh ("Walsh") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020. Walsh is a partner and co-founder of Silverpeak, an alternative investment management firm that was part of a joint venture that controlled DiamondPeak's sponsor. Defendant Walsh knowingly, recklessly, or negligently made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements. Defendant Walsh negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger. As of November 30, 2020, Walsh beneficially owned 1,896,960 shares of Lordstown Class A common stock and 802,832 warrants that were worth more than $53 million. Walsh agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

28. Defendant Andrew C. Richardson ("Richardson") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020. In connection with the Merger, Richardson received 88,357 founder shares of Class A common stock, which were valued at more than $1.6 million at the time. Defendant Richardson knowingly,

recklessly, or negligently made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Richardson negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.  Richardson agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

29.     Defendant Steven R. Hash ("Hash") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.  In connection with the Merger, Hash received 88,357 founder shares of Class A common stock which were valued at more than $1.6 million at the time.  Defendant Hash knowingly, recklessly, or negligently made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Hash negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with the proxy solicitation of stockholder votes in favor of the Merger.   Hash agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

30.     Defendant Judith A. Hannaway ("Hannaway") served as a director of DiamondPeak beginning prior to its IPO until the Merger closed on October 23, 2020.  In connection with the Merger, Hannaway received 88,357 founder shares of Class A common stock, which were valued at more than $1.6 million at the time.  Defendant Hannaway knowingly, recklessly, or negligently made (or allowed to be made) improper statements in Lordstown's (specifically its predecessor, DiamondPeak's) SEC filings, press releases, and other public statements.  Defendant Hannaway negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements

in connection with the proxy solicitation of stockholder votes in favor of the Merger.  Hannaway agreed to resign from DiamondPeak's board of directors upon the closing of the Merger.

31.     Defendants Burns, Hamamoto, Walsh, Richardson, Hash, and Hannaway are the "Individual Proxy Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

32.     Lordstown is an electric vehicle ("EV") company headquartered in Lordstown, Ohio. The Company's first production automobile is the Endurance, a full-size electric pickup truck that the Company claimed got about 250 miles of range on a single charge. According to the Company, the Endurance is powered by four electric hub motors, with each wheel having its own motor. Defendants promoted this technology as allowing the Endurance to deliver varying amounts of torque to each wheel—an important factor in selling pickup trucks as torque is critical when hauling heavy loads.

33.     DiamondPeak is a blank check company or "SPAC" formed under the laws of the State of Delaware on November 13, 2018 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. DiamondPeak was led by Defendant Hamamoto, its CEO and Chairman. DiamondPeak's sponsor, DiamondPeak Sponsor LLC, was a joint venture between an entity controlled by Defendant Hamamoto (DHP SPAC Sponsor LLC) and an entity controlled by the principals of Silverpeak (SP SPAC Sponsor LLC), an alternative investment management firm, led by its partners including Defendant Walsh.

34.     On August 3, 2020, DiamondPeak and Lordstown jointly announced that they had entered into a definitive agreement for a business combination, which would result in Lordstown

becoming a publicly traded company. DiamondPeak filed with the SEC a Current Report on Form 8-K concerning the Merger announcement, attaching the agreement and plan of merger, a form subscription agreement, an August 3, 2020 joint press release announcing the Merger, an August 3, 2020 investor slide presentation, a transcript from an August 3, 2020 joint conference call, and a script from an Endurance commercial. The Form 8-K specifically noted: "[t]he Company [DiamondPeak] and its directors and executive officers may be deemed to be participants in the solicitation of proxies from the stockholders of the Company in respect of the Merger. . . . LMC [Lordstown] and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of the Company in connection with the Merger."

35. The August 3, 2020 investor presentation stated, under the heading "investment highlights," that demand for the Endurance was "proven with pre-orders covering first year of production." In the weeks leading up to the shareholder vote, the Company continued to tout the pre-order numbers for the Endurance. The August 3, 2020 slides further boasted that "existing pre-orders have been achieved with minimal marketing costs," suggesting that the orders were largely driven by pent-up demand from the "Fleet Market."

36. The August 3, 2020 slides also touted a "Working Prototype" and showed that Lordstown had received "Significant Pre-Orders" of about 27,000 pre-sales for the Endurance, which represented "potential revenue sufficient to cover 2021 production and into 2022," and set forth a timeline for commercial production beginning in the third quarter of 2021.

37. The same day, Lordstown and DiamondPeak issued a joint press release announcing the Merger, which, upon closing, would result in the combined company remaining listed on the NASDAQ under the ticker symbol "RIDE." The press release stated that "[a]pproximately $675 million of gross proceeds that are expected from the transaction will be

used to fund production of the Endurance and its innovative in-wheel electric hub motor design." The press release also highlighted that Lordstown had received more than 27,000 pre-orders for the Endurance, representing more than $1.4 billion of potential revenue. It also stated that the boards of directors of DiamondPeak and Lordstown had both "unanimously approved the proposed transaction," which was expected to close in the fourth quarter of 2020, subject to the approval by DiamondPeak's stockholders.

38.      On August 24, 2020, DiamondPeak filed its preliminary proxy statement on Schedule 14A with the SEC, in which DiamondPeak's board of directors requested that stockholders vote in favor of the Merger. The filing touted Lordstown's 27,000 pre-orders from fleet operators and repeated that the Company expected full production to begin in 2021, with 2,200 vehicles produced and sold that year.

39.      On September 17, 2020, the Company filed a Form 8-K with the SEC announcing that Lordstown and DiamondPeak hosted an analyst day to provide an overview of Lordstown's business and discuss historical and projected financial performance. The Company also hosted an investor presentation that same day "to discuss various maters including recent developments with respect to Lordstown and the electric vehicle industry generally." The Form 8-K included both presentations, which utilized a slide deck nearly identical to the one published on August 3, 2020, once again touting the Company's "preorders covering first year of production" and listing certain of its "Selected Pre-Order Customers," though now touting "$2.0bn+ of Existing Pre-Orders." Elsewhere, the presentation's new "Clear Path to be First to Market" slide was now revised to read in pertinent part that "Lordstown has received ~40k pre-orders for the Endurance despite the fact that production is not slated to begin until 2021, representing potential revenue sufficient to cover production into 2023." In a later interview, Defendant Burns noted that these 40,000 pre-orders

are "just a pent-up demand" for the first all-electric pickup truck in the market, and emphasized that, "I don't think we've even scratched the surface."

40.     The statements referenced in ¶¶ 35-39 above concerning Lordstown pre-orders, pre-order customers, and the demand for its Endurance pickup truck, along with the statements concerning its production timeline and sales estimates, were false and materially misleading. Defendants failed to disclose: (1) the number of Endurance pre-orders was fabricated, and therefore inflated, and thus did not accurately reflect demand; and (2) Lordstown had fabricated the pre-orders in order to give prospective investors a false sense of confidence.

### B.     The Materially False and Misleading Proxy Statement

41.     On October 8, 2020, DiamondPeak filed the Proxy Statement, which claimed that while Lordstown Motors had only "engaged in limited marketing activities," it already had pre-orders for more than 38,000 vehicles, primarily from fleet purchasers.

42.     Under the heading "Risk Factors" the Proxy Statement states that "***Lordstown does not have any current customers or any pending orders and there is no assurance nonbinding pre-orders will be converted into binding orders or sales.***"[1]  Specifically, the Proxy Statement elaborates:

> Lordstown's business model is focused on building relationships with large fleet customers. To date, Lordstown has engaged in limited marketing activities and Lordstown has no binding contracts with customers. ***The non-binding pre-orders that Lordstown has signed did not require customer deposits and may not be converted into binding orders or sales. Until the time that the Endurance's design and development is complete and is commercially available for purchase, and Lordstown is able to scale up its marketing function to support sales, there will be uncertainty as to customer demand for the Endurance.*** The potentially long wait from the time a pre-order is made until the time the Endurance is delivered, and any delays beyond expected wait times, could also impact user decisions on whether to ultimately make a purchase. Even if Lordstown is able to obtain binding orders, customers may limit their volume of purchases initially as

---

[1] All emphasis added unless otherwise noted.

they assess Lordstown's vehicles and whether to make a broader transition to electric vehicles. This may be a long process and will depend on the safety, reliability, efficiency and quality of Lordstown's vehicles, as well as the support and service that Lordstown offers.

43. Additionally, the Proxy Statement states that "***Lordstown may not be able to accurately estimate the supply and demand for its vehicles***, which could result in a variety of inefficiencies in its business and hinder its ability to generate revenue. If Lordstown fails to accurately predict its manufacturing requirements, it could incur additional costs or experience delays." The Proxy Statement further provides:

> Lordstown will be required to provide forecasts of its demand to its suppliers several months prior to the scheduled delivery of products to its prospective customers. Currently, there is no historical basis for making judgments on the demand for Lordstown's vehicles or its ability to develop, manufacture, and deliver vehicles, or Lordstown's profitability in the future. If Lordstown overestimates its requirements, its suppliers may have excess inventory, which indirectly would increase Lordstown's costs. If Lordstown underestimates its requirements, its suppliers may have inadequate inventory, which could interrupt manufacturing of its products and result in delays in shipments and revenues. In addition, lead times for materials and components that Lordstown's suppliers order may vary significantly and depend on factors such as the specific supplier, contract terms and demand for each component at a given time. If Lordstown fails to order sufficient quantities of product components in a timely manner, the delivery of vehicles to its customers could be delayed, which would harm Lordstown's business, financial condition and operating results.

44. The October 8, 2020 statements concerning Lordstown's ability to meet its commercial production and sales milestones, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading as set forth in ¶40 above. In addition, Defendants (1) failed to disclose a substantial amount of these "pre-orders" for the Endurance consisted of orders from customers that did not operate commercial fleets or did not have the financial means to purchase the trucks; (2) the Company faced significant production obstacles and, moreover, had not yet completed testing and validation required to meet federal safety standards; and (3) as a result of the foregoing, the Proxy Statement's positive statements about

Lordstown's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  Further, the purported "Risk Factors" misrepresented and failed to disclose the true risks associated with Lordstown's reported pre-orders because, among other things, the Company had secretly paid consultants for each pre-order received such that they were highly motivated to and did accumulate largely fictitious pre-orders from "customers" lacking the intent and/or means to purchase the trucks.

### C.      Additional False and Misleading Statements Throughout the Class Period

45.      On October 26, 2020, the first day Lordstown became a publicly traded company as a result of the Merger with DiamondPeak, Defendant Burns stated this was a "momentous occasion" for the Company and that Lordstown was "looking forward to combining the Company's EV startup culture with the infrastructure and assets we already have in place in order to successfully achieve our production milestones."  Burns also asserted that the Company had "a near production-ready plant and approximately $675 million in proceeds from this transaction, which is more than enough funding to get us through initial production."

46.      In an interview with *The Business Journal* that same day, Burns highlighted that the Company's beta vehicles were "nearly production ready" and would launch into full production by September 2021. Burns also noted that the previously announced 40,000 pre-orders are "just a pent-up demand" for the first all-electric pickup truck in the market, and emphasized that, "I don't think we've even scratched the surface."

47.      On November 16, 2020, Lordstown issued a press release announcing that the Company had received 50,000 non-binding pre-orders from commercial fleets for the Endurance, adding that "[t]his figure does not capture interest the company has received from organizations that are not in position to be able to place pre-orders."

48.     In an interview on CNBC's Mad Money the following day, on November 17, 2020, Defendant Burns declared "we sell to commercial fleets. That's our first customer. And like I said, we've already got 50,000 pre-orders." Burns went on to say that most of the orders were signed by the CEOs of large firms, which caused him to characterize them as "very serious orders."

49.     On December 4, 2020, the Company filed a Prospectus Form 424 with the SEC in which the Company reported that it had received "pre-orders from fleet operators to purchase approximately 50,000 Endurance vehicles."

50.     Thereafter, the Company continued to promote the purportedly ever-increasing numbers of pre-orders for the Endurance. For example, on December 21, 2020, Lordstown announced that it received 80,000 non-binding reservations for the Endurance. In a Tweet promoting the news, the Company declared, "we have hit a new milestone."

51.     On January 11, 2021, Lordstown issued press release announcing the Company had reached a record 100,000 pre-orders for the Endurance, with an average order size of 600 vehicles per fleet. In this release, Defendant Burns stated: "[r]eceiving 100,000 pre-orders from commercial fleets for a truck like the Endurance is unprecedented in automotive history . . . . Adding in the interest we have from federal, state, municipal and military fleets on top of that, I think you can see why we feel that we are about to revolutionize the pickup truck industry." This press release further provided that "Lordstown is now building the first Beta Endurance vehicles and is on track for start of production in September of this year."

52.     On January 28, 2021, Lordstown issued a press release providing business updates, and stating that the Company was "Prepar[ing] Ohio Factory to Begin Building Betas Next Month." Defendant Burns stated that "[w]e are hard at work in the factory preparing to begin Beta builds in the coming weeks," and that "[w]ith this step on the horizon, we remain on track to meet

our September start-of-production timeline while continuing to see indicators of strong demand for an all-wheel drive, full-size electric pickup truck with 250 miles of range from commercial, government and military fleets."

53.     The statements referenced in ¶¶ 45-52 were materially false and/or misleading for the reasons set forth in ¶¶ 40 and 44 and because Defendants failed to disclose that due to significant logistical obstacles, production of the Endurance remained at least three to four years away.

54.     On February 17, 2021, Lordstown received a non-public request from the SEC for the voluntary production of documents and information, including relating to the Merger and the pre-orders of the Company's Endurance pickup truck. Lordstown did not publicly disclose the SEC's inquiry.  The Defendants' failure to disclose the SEC investigation rendered their previous statements concerning the Merger and the Company's pre-orders materially misleading.

55.     On February 23, 2021, in an interview with Yahoo! Finance Live, Defendant Burns stated: "[o]ur initial foray is into fleets, and we have pre-sold 100,000 of these vehicles to various fleets across America – really a big appetite."  He continued: "[y]ou've got a fleet using a 17-mile per gallon pickup truck for the last 30 years and we come out with one that gets the equivalent of 75 miles per gallon. There is a lot of demand and excitement about it."  This interview further provided that "Burns said production for the Endurance will begin in September. That will make the Endurance the first all electric pickup truck on the market."

56.     The February 23, 2021 statements concerning Lordstown's commercial production timeline, its pre-orders, and the demand for its Endurance pickup truck were false and materially misleading for the reasons set forth at ¶¶40, 44, and 53 above.  Additionally, Defendants' failure to disclose the SEC investigation rendered the statements concerning Lordstown's commercial

production timeline, its pre-orders, and the demand for its Endurance pickup truck incomplete and materially misleading.

### D.    The Truth Begins to Emerge

57.    On March 12, 2021, the Hindenburg Report was published before markets opened. In it, the investment research and reporting firm Hindenburg Research ("Hindenburg") revealed that the Company had "no revenue and no sellable product" and "misled investors on both its demand and production capabilities."  The Hindenburg Report found that "Lordstown's order book consists of fake or entirely non-binding orders, from customers that generally do not even have fleets of vehicles."

58.    In support of its findings, the Hindenburg Report stated that Hindenburg's "conversations with former [Lordstown] employees, business partners and an extensive document review show that the company's orders are largely fictitious and used as a prop to raise capital and confer legitimacy."  The Hindenburg Report cited several examples of "fake pre-orders" in the Company's purported 100,000 vehicle book from customers that did not operate a commercial fleet and/or did not have the ability to purchase the trucks.  For example, the Hindenburg Report highlighted a $735 million 14,000 truck order (representing almost 18% of the Company's pre-orders at the time) from a two-employee, non-registered corporation apparently operating out of an individual's studio apartment, and a $52.5 million 1,000-truck order (representing ~13% of the Company's total order book) from a company whose mailing address was a UPS Store and had no fleet of its own or plan to actually purchase the vehicles.

59.    The Hindenburg Report further detailed how, in early 2020 and with a capital raise on the horizon, Defendant Burns was desperate to increase the number of pre-orders for the Endurance.  To accomplish this goal, the Company hired Climb2Glory, a small consulting firm.

Climb2Glory was paid $30 to $50 per pre-order for the Endurance.  That company's website directly linked the pre-orders with Lordstown's ability to raise capital—"the more pre-orders achieved, the greater the confidence levels of prospective borrowers."

60.     The Hindenburg Report further described why the Endurance was actually three to four years away from production—a stark contrast to the Company's recent statements that it was on track to start production on the Endurance in September 2021.  Hindenburg based its finding on interviews with former Company employees and documents obtained through a Freedom of Information Act ("FOIA") request.  For example, the Hindenburg Report highlighted an interview with a former Lordstown employee who detailed how Lordstown had built fewer than 10 prototypes to date and had not completed any of the required testing and validation of the prototypes.

61.     In response to the release of Hindenburg Report, Lordstown's stock price fell $2.93 per share on March 12, from a close of $17.71 per share on March 11, 2021, to close at $14.78 per share on March 12, 2021, a decline of approximately 17%.

62.     Then, on March 17, 2021, the Company announced financial results for the fourth quarter of 2020, reporting a net loss of $101 million.  In a call with investors conducted after the market closed, Defendant Burns added to the bad news by disclosing for the first time that the SEC had launched an investigation into the Company.  Burns stated that the Company's board of directors had formed a special committee to conduct an internal inquiry. On this news, Lordstown's share price fell another $2.08 per share, or nearly 14%, from a close of $15.09 per share on March 17, 2021, to a close of just $13.01 per share on March 18, 2021.

63.     Finally, on March 24, 2021, Hindenburg published some "behind the scenes" pictures of an Endurance breaking down. The photographs were reportedly made in the summer of

2020 during the filming of an Endurance commercial, which aired days prior to the announcement of the Merger. On this news, shares of Lordstown declined another $1.21 per share, closing at $11.38 per share on March 24, 2020—representing a 40% decline from the day Lordstown's stock first started trading on the NASDAQ following the Merger.

## V.    CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the class, consisting of all those who purchased Lordstown common stock during the Class Period and persons and entities that purchased and held DiamondPeak common stock as of September 21, 2020, and who had the right to vote on the Merger, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of the the Individual Proxy Defendants, any subsidiary or affiliate of Lordstown and the directors, officers, and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person.

65.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lordstown's common stock was actively traded on the NASDAQ, an open and efficient market, under the symbol "RIDE." Millions of Lordstown shares were traded publicly during the Class Period on the NASDAQ. As of October 22, 2020, Lordstown had approximately 165 million shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and the other members of the Class may be identified from records maintained by Lordstown and/or its transfer agents and may be notified of the pendency of

this action by mail, using a form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b)      whether statements made by Defendants in the Proxy Statement or in other Proxy-related materials omitted and/or misrepresented material facts about the business, operations, and prospects of Lordstown;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Lordstown;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance, and prospects of Lordstown;

e) whether the market price of Lordstown common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. **UNDISCLOSED ADVERSE FACTS**

70. The market for Lordstown's common stock was an open, well-developed, and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Lordstown's stock traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Lordstown's stock relying upon the integrity of the market price and market information relating to Lordstown and have been damaged thereby.

71. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Lordstown's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. These statements and omissions were materially false and

misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, financial operations, and prospects, as alleged herein.

72.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Lordstown's financial well-being and prospects.

73.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## VII.   **LOSS CAUSATION**

74.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Lordstown's common stock and operated as a fraud or deceit on Class Period purchasers of Lordstown's shares and holders of DiamondPeak's shares by failing to disclose to investors that the Company's business operations, financial results, and future prospects were materially misleading and misrepresented material information.   When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Lordstown's stock fell precipitously as the prior inflation was removed from the share price.   As a result of their

purchases of Lordstown's common stock and/or holding DiamondPeak's stock during the Class Period, Plaintiff and the other Class members suffered economic loss.

75.     By failing to disclose the true state of the Company's business operations, financial statements, and future prospects, investors were not aware of the Company's true state.  Therefore, Defendants presented a misleading picture of Lordstown's business practices and procedures. Instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Lordstown to conceal the truth.

76.     Defendants' false and misleading statements had the intended effect and caused Lordstown's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

77.     The decline in the price of Lordstown's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Lordstown's common stock price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Lordstown's stock and the subsequent decline in the value of Lordstown's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  SCIENTER ALLEGATIONS

78.     As alleged herein with respect to the claims brought under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, Burns and the Company acted with scienter in that

Burns and the Company knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79. As set forth herein, Defendant Burns, by virtue of his receipt of information reflecting the true facts regarding Lordstown, his control over, receipt and/or modification of Lordstown's allegedly materially misleading statements and omissions, and/or his positions with the Company which made Burns privy to confidential information concerning Lordstown, participated in the fraudulent scheme alleged herein.

## IX.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

80. At all relevant times, the market for Lordstown's common stock was an efficient market for the following reasons, among others:

a) Lordstown stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market;

b) As a regulated issuer, Lordstown filed periodic public reports with the SEC and the NASDAQ;

c) Lordstown shares were followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d)      Lordstown regularly issued press releases, which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

81.      As a result of the foregoing, the market for Lordstown's common stock promptly digested current information regarding Lordstown from all publicly available sources and reflected such information in Lordstown's stock price.   Under these circumstances, all purchasers of Lordstown's shares and holders of DiamondPeak's shares during the Class Period suffered similar injury through their purchase of Lordstown's stock at artificially inflated prices and a presumption of reliance applies.

82.      A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Lordstown's business operations and practices, financial results, and internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.      NO SAFE HARBOR

83.      The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

84.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Lordstown who knew that the statement was false when made.

## XI.    CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against Defendants Lordstown and Burns**

1.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against the Company and Defendant Burns.

2.     During the Class Period, Defendants Lordstown and Burns carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lordstown common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Lordstown common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

3.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Lordstown common stock in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Proxy Defendants is also sued herein as control persons of the Company and/or DiamondPeak, as alleged herein.

4.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

5.     Lordstown and Burns, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations, and future prospects of Lordstown as specified herein.  Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lordstown's value and performance and substantial growth. These acts, practices, and conduct included the making of, or the

participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Lordstown and its business, operations, and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants also engaged in transactions, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Lordstown's stock during the Class Period.

6. Defendant Burns' primary liability, and controlling person liability, arises from the following facts: (i) Burns was a high-level executive and director at the Company during the Class Period; (ii) Burns, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's operational and financial projections and/or reports; (iii) Burns was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) Burns was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

7. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Lordstown's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, Burns, if he did not have actual

knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

8.      As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Lordstown securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Lordstown shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Lordstown securities during the Class Period at artificially inflated high prices and were damaged thereby.

9.      At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects, and intrinsic value of Lordstown, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Lordstown securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

10.     By virtue of the foregoing, Lordstown and Burns each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

11.     As a direct and proximate result of the Lordstown's and Burns's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 14(a) of the Exchange Act and
Rule 14a-9 Promulgated Thereunder
Against All Defendants**

12.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

13.     This Count is asserted against all Defendants under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Plaintiff and the members of the proposed Class who were damaged thereby.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims

14.     Between August 3, 2020 and October 22, 2020, the Defendants solicited stockholder votes in favor of the Merger through use of materially false and misleading statements and failures to disclose in their proxy solicitations as set forth at ¶¶ 69-87, above.

15.     On October 8, 2020, DiamondPeak filed its Proxy Statement with the SEC, which was subsequently mailed to DiamondPeak shareholders of record as of September 21, 2020.  The Proxy Statement solicited proxies from DiamondPeak shareholders to vote in favor of the Merger at a special meeting to be held on October 22, 2020.

16.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[it] shall be unlawful for any person by use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the

public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 78(1)]."

17.     SEC Rule 14a-9, 17 C.F.R. § 240.14a(9), promulgated pursuant to Section 14(a), prohibits the issuance of any Proxy Statement "which, at the time and in light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

18.     Plaintiff and other members of the proposed Class were solicited to vote to approve the Merger between Lordstown and DiamondPeak. A shareholder vote was required to approve this proposal. Consequently, the Proxy Statement was an essential link in the accomplishment of this proposal. The Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders, which were made for the purpose of soliciting stockholder votes to approve DiamondPeak's acquisition of Lordstown in the Merger. In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements made would be rendered materially false and misleading.

19.     The Defendants provided information that was contained in the Proxy Statement, allowed their names to be used in conjunction with the Proxy Statement and solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Statement, solicited votes under the Proxy Statement, and caused the Proxy Statement to be

disseminated to the Plaintiff and the other members of the proposed Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

20.     The Defendants solicited approval for the Merger from the Plaintiff and other members of the proposed Class by means of a Proxy Statement that contained false and misleading statements, concerning, *inter alia*, the Merger and its benefits to shareholders, while also omitting to state material facts that were necessary to make their statements contained therein not false or misleading. The Defendants made other public statements, as alleged herein, subsequent to the mailing of the Proxy Statement that were similarly false and misleading and were intended to influence the shareholder vote.

21.     The proxy solicitation process was an essential link in the approval of the Merger. The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to evaluate the issues and opinions described in the Proxy Statement, or a material part of the mix of information available to the Class members in determining how to exercise their voting rights.

22.     Plaintiff and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger.

23.     None of the materially false and misleading statements contained in the Proxy Statement, or material matters omitted from the Proxy Statement, as described above, were known to the public (including Plaintiff) at the time the vote on the Merger occurred.  As a direct and proximate result of the Defendants' wrongful conduct, DiamondPeak, Lordstown, and the Individual Proxy Defendants misled DiamondPeak's stockholders by making materially false and

misleading statements that were an essential link in stockholders heeding the DiamondPeak board of directors' recommendation to approve the acquisition of Lordstown.

24.     The Defendants violated § 14(a) of the Exchange Act and Rule 14a-9 by issuing the false and misleading Proxy Statement to solicit and obtain the votes of DiamondPeak shareholders to approve the Merger.  In their Proxy Statement, the Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

25.     Plaintiff and other members of the proposed Class have suffered damages as a result of the Merger, which was approved through the use of the Proxy Statement in violation of Section 14(a) of the Exchange Act of and Rule 14a-9 promulgated thereunder.

## COUNT III
### Violation of Section 20(a) of the Exchange Act
### Against Burns and the Individual Proxy Defendants

26.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against Burns.

27.     Burns was and acted as a controlling person of Lordstown within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions with the Company, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the Company's actual performance, Burns had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Burns was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

28.     In addition, Burns had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

29.     As set forth above, Lordstown and Burns each violated § 10(b) and Rule 10b-5 through their acts and omissions as alleged in this Complaint.  Burns also violated § 14(a) through his acts and omissions alleged in this Complaint.  By virtue of his controlling positions, Burns is liable pursuant to § 20(a) of the Exchange Act.

30.     Because of their positions of control and their authority over DiamondPeak and Lordstown, the Individual Proxy Defendants were able to and did control the actions of the companies, their employees, and the contents of the proxy solicitations, as set forth herein. The Individual Proxy Defendants therefore qualify as "controlling persons" within the meaning of Section 20(a) of the Exchange Act. By reason of the above conduct, the Individual Proxy Defendants are also, or alternatively, liable as control persons of Lordstown (or its predecessor) pursuant to Section 20(a) of the Exchange Act.

31.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Lordstown's stock and/or DiamondPeak's stock during the Class Period.

## XII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

c) Awarding such other relief as this Court deems appropriate.

## XIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

DATED: May 13, 2021

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA**
**& GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

*Local Counsel for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

David R. Kaplan
12750 High Bluff Drive, Suite 475
San Diego, California 92130

Telephone: (858) 997-0860
Facsimile: (858) 369-0096
dkaplan@saxenawhite.com

***Counsel for Plaintiff***